IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KIMBERLY SHARKINS,<br><br>Plaintiff,<br><br>v.<br><br>MONTGOMERY COUNTY BOARD OF EDUCATION, et al.,<br><br>Defendants. | ) | CASE NO. 2:24-CV-428-KFP |

**MEMORANDUM OPINION AND ORDER**

This is an employment discrimination case rooted in Plaintiff Dr. Kimberly Sharkins's resignation from her employment with Defendants Montgomery Public Schools and Montgomery County Board of Education. Dr. Sharkins alleges unlawful discrimination in violation of Title VII. Doc. 1.

The parties consented to a United States Magistrate Judge conducting all proceedings in this case through final judgment. Docs. 20, 21, 22. Before the Court is Defendants' Motion for Summary Judgment. Doc. 47. Upon consideration of the motion, supporting memorandum (Doc. 49), Dr. Sharkins's response (Doc. 53), Defendants' reply (Doc. 55), and the parties' evidentiary submissions (Docs. 48, 54), the Court finds Defendants' motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party . . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for "summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The relevant rules of substantive law dictate the materiality of a disputed fact." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks omitted). In determining whether a genuine dispute of fact for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam); *see also* Fed. R. Civ. P. 56(a).

To survive a properly supported motion for summary judgment, a plaintiff must

produce some evidence supporting her claims. *See Celotex Corp.*, 477 U.S. at 322. She must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. A plaintiff's conclusory allegations do not provide sufficient evidence to oppose a motion for summary judgment. *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (per curiam). Consequently, when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case" on which he will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 322–23. Where all the evidentiary materials before the court indicate that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, the entry of summary judgment is proper. *Id.* at 322; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48 (emphasis omitted)). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are not contested, and the Court concludes that venue

properly lies in the Middle District of Alabama. 28 U.S.C. § 1391.

## III. BACKGROUND[1]

Dr. Sharkins, a Caucasian woman, began her employment with Montgomery Public Schools in August 2017 as the Director of Early Learning/Early Childhood. Doc. 48-1 at 26:10-11; Doc. 48-3 at 23:16-17.[2] Her job was multifaceted and included, among other things, developing an early childhood educational approach, supporting children within the school, expanding pre-k services, and providing oversight for various programs. Doc. 48-1 at 27:2-28:15. After the Alabama Literacy Act was passed in 2019, her job included creating a support system for the reading specialists, managing their budget, hiring them, and supporting the kindergarten, first grade, and second grade students in a variety of ways. *Id*.

For the majority of Dr. Sharkins's tenure, Defendants operated under the State Department of Education intervention due to their academic and financial deficiencies. Doc. 48-3 at 186. As a result of that intervention and related turnover, Dr. Sharkins worked under multiple supervisors and superintendents, relevant here, three African American males and one African American female. These included Dr. Bernard Mitchell, who was the Chief Acting Officer and later the Director of Strategy and Interventions; Dr. Monte Linebarger, who was the Chief Academic Officer; Melvin Brown, who was the superintendent; and Jamie Wilson, who was the assistant superintendent. Doc. 48-2 at 11:

---

[1] The Court presents only those facts pertinent to resolving the Motion for Summary Judgment. "[T]he facts at this stage are what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party who was opposing summary judgment[.]" *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020).

[2] The citations to the record are to the PDF page numbers on the document in the Court's docket.

5-9; Doc. 48-4 at 14:1-2; Doc. 48-3 at 204. Dr. Sharkins reported directly to Dr. Mitchell from 2017 to 2023 and directly to Dr. Linebarger from 2023 until her resignation. Doc. 48-2 at 11:12-13; Doc. 48-4 at 14:15-18. Over the course of her employment, the following relevant events occurred.

**A. Letters/Memos of Concern Issued to Dr. Sharkins**

During her employment with Montgomery Public Schools, Dr. Sharkins received at least three different written communications characterized as memos of concern, including two at issue in this case: a letter of concern dated March 17, 2023, regarding her "failure to effectively lead and monitor the Kindergarten Open House" (Doc. 54-5 at 2), and a memo of concern dated May 2, 2023, regarding the status of the Early Learning Program. 48-7 at 2.

**1. Letter of Concern regarding the Kindergarten Open House**

In December 2022, Dr. Sharkins was put in charge of the Kindergarten Roundup open house scheduled on February 23, 2023. Doc. 48-1 at 82:17-21; Doc. 48-3 at 47:15-18. This project required her to work across multiple teams and personnel groups, such as the communications department and IT department. Doc. 48-1 at 83:7-15. According to Dr. Sharkins, at the onset of receiving this assignment there were several things out of her control that posed a threat of delay. Doc. 48-3 at 218. The project was ultimately delayed until March 13, 2023, and delayed again until March 30, 2023. Doc. 48-3 at 48:5-12. After the second delay, Wilson (the then-assistant superintendent) asked Dr. Sharkins to announce the event at a staff meeting; however, Dr. Sharkins refused because she knew the event was not going to be ready by the scheduled date. Doc. 48-1 at 83:7-84:13. As

explained by Dr. Sharkins, her refusal "apparently made [Wilson] mad." Doc. 48-1 at 84:8-9. A day later, on March 17, 2023, Defendants issued a letter of concern to Dr. Sharkins regarding her "failure to effectively lead and monitor the Kindergarten Open House." Doc. 54-5 at 2. This letter was considered discipline, not correction. Doc. 48-3 at 59:4-5. The letter stated, among other things, that administration has "continuously witnessed a high degree of non-responsiveness on [Dr. Sharkins] part of leading the initiative," and that "[the administration] has accepted the need to constantly review and support the responsibility of this assignment with others." Doc. 54-5 at 2. It also listed other specific failures, such as the failure to make principals aware of timelines, and the failure to check for scheduling conflicts. *Id*. The memo alleged that these failures contributed to the necessary delays of the open house. *Id*. Dr. Sharkins responded to this letter by, among other things, pointing to the fact that she felt many factors contributing to the delay were beyond her control. Doc. 54-6 at 2.

**2. Memo of Concern regarding the status of the Early Learning Program**

After a department audit, on May 2, 2023, the Board, which at this point included Dr. Linebarger, placed a "memo of concern" in Dr. Sharkins's personnel file. Doc. 48-7 at 2. This memo was not considered discipline. Doc. 48-3 at 59:4-5. The memo expressed general concern regarding the status of the Early Learning Program. Doc. 48-7 at 2. Specifically, that Dr. Sharkins lacked an administrative certification, which was required because, "[the] job duties and responsibilities require the director to be able to supervise staff." *Id*. The memo also complained of, "[i]nadequate guidance, procedures, and follow

through of Local Reading Specialist[;] [i]nadequate collaboration with the education specialist and Alabama Reading Initiative (ARI)[;][and] [i]nadequate guidance and follow through regarding the Alabama Literacy Act." *Id*.

In regard to the administrative certification requirement, this was not the first time that Dr. Sharkins had been made aware that she was missing it. Between August 2022 and March 2023, at least one conversation was had between Dr. Mitchell (her then-supervisor) and Dr. Sharkins regarding obtaining the certification. Doc. 48-1 at 102:11-103:22. According to Defendants, although this certification was not a listed requirement in her original 2017 job description (Doc. 48-3 at 223-224), there was an applicable state statute that requires a supervisor, if performing evaluations, to hold the administrative certification. Doc. 48-3 at 60:7-10. While Dr. Sharkins was not needed to evaluate employees when she was hired, Defendants testified that need had changed, and the new superintendent now required it. *Id*. at 76:2-78:11. According to Dr. Linebarger, the superintendent and the chief of staff "expressed a concern that all personnel who are supervising staff" should have the credential. Doc. 48-4 at 35:4:9. Without the certification, Dr. Sharkins was unable to evaluate the education specialist working under her, Tara Carr. Doc. 48-1 at 104:2-5. This duty was performed instead by someone with a certificate despite Carr reporting to Dr. Sharkins. Doc. 48-3 at 125:18-126:1.

According to Dr. Sharkins, she offered to obtain the certification (without a written proposal) but did not have support from Defendants; however, Defendants maintain that Dr. Sharkins never requested the opportunity to obtain the certification. Doc. 48-1 at 62:11-16, 106:20-22, 109:15-23; Doc. 48-3 at 62:2-5. As a result of this memo, Dr. Sharkins

believed she would be fired because she lacked the administrative certification. *Id*. at 113:1-4.

**B. March 2023 Performance Evaluation**

According to Dr. Sharkins, at Montgomery Public Schools, performance evaluations involved self-assessments where the employee identified strengths and weaknesses. Doc. 48-1 at 56:10-23. The employee would then take the assessment to a supervisor, and the supervisor would either agree or disagree and provide feedback. *Id*. at 57:6-8.

In March 2023, Dr. Sharkins had an evaluation with Dr. Mitchell. She received a variety of scores in different areas of her evaluation, including one in which she received a score of four out of five stars. Doc. 48-1 at 68:10-17. However in another area, Dr. Sharkins presented support, according to her, for a four out of five stars rating. Doc. 48-1 at 61:8-10. In response to her presentation during the self-assessment and evaluation meeting, Dr. Sharkins alleges that Dr. Mitchell stated, "he was not permitted to give" her the requested four rating because "they wouldn't allow it." *Id*. at 61:12-13. Dr. Sharkins did not follow up to determine whom Dr. Mitchell was referring. *Id*. at 16-18. The rating did not affect her pay and duties. *Id*. at 66:8-15. Dr. Sharkins testified that at the end of the meeting, due to several concerns, among other things, the tension within MPS and the kindergarten open house memo of concern she received, Dr. Mitchell informed her to begin looking for another job.[3] Doc. 48-1 at 70:1-76:5.

---

[3] There was one other occasion where Dr. Sharkins alleges in her deposition that she was told to look for another job. However, that instance involves an ambiguous recollection of a conversation in which Dr.

### C. The October 2023 Office Relocation

On October 6, 2023, Dr. Linebarger, who oversaw the Montgomery Public School's staff relocation to a newly-renovated building, emailed room assignments to staff and expressed his intent to have everyone moved from the older central offices to the new office by October 23, 2023. Doc. 48-4 at 121. The assignment sheet attached to the email specified Dr. Sharkins's new office location. *Id*. at 122.

**NEW BUILDING OFFICE ASSIGNMENTS**

| | EDUCATION SPECIALIST | AREA | ROOM NUMBER | |
|---|---|---|---|---|
| 1 | Adams, Heather | Lead ESL Teacher (Ussery) | [redacted] | TBD |
| 2 | Carr, Tara | Pre-K | Cubicle 1- | ED Entrance |
| 3 | Daughty, Ronnie | ELA K-5 | 122 | |
| 4 | Fenster, Jessica | District Literacy | Cubicle 1- | Blowe Entrance |
| 5 | Floyd, Sonja | Math -K-5 | 117 | |
| 6 | Harris, LaShaunda | History | 121 | |
| 7 | Hillary, Forest | Career and College Readiness | Cubicle 2 | Blowe Entrance |
| 8 | Huntley, Yolanda | Library Media | Building D | |
| 9 | Johnson, Bridgette | ELA | 120 | |
| 10 | McKnight, Natalie | ARTS | 110 | |
| 11 | Rice, Curtis | Math 6-12 | 118 | |
| 12 | Tabb, Quanteria | Science 6-12 | 114 | |
| 13 | Ussery, Lizzette | ESL | [redacted] | TBD |
| 14 | Williams, Shaniece | Science K-5 | 113 | |
| 15 | Sharkins, Kimberly | Director- Pre-K | Building D Next to Huntley | Building D Next to Huntley |
| 16 | Sibley, LaTonya | Director -Career Tech/MPACT | Room 108 | |

Doc. 54-10; Doc. 48-1 at 134:2-12.

Sharkins could not remember the date or what she and Dr. Mitchell were discussing. Although she states that she believes the advice was because of her race, Dr. Sharkins does not reference this event in her opposition to summary judgment and, thus, has abandoned it, and it will not be included in the Court's analysis.

Chad Anderson, Chief of Operations for Montgomery Public Schools, also assisted in the move. During the preliminary stages, he testified that Dr. Sharkins was given input into what the new space would look like. Doc. 48-5 at 27:2-7. According to Dr. Sharkins, Dr. Linebarger had written her name on a piece of paper and taped it on a door in the new space. Doc. 48-1 at 141:18-21.

Dr. Sharkins was out of town the week of October 16, 2023, when all the personnel on her floor moved to the new facility. Doc. 48-5 at 26:19-21; Doc. 48-1 at 135:13-16. Anderson testified that if her Montgomery Public Schools-owned items were ready and packed up in boxes, they would have been moved when the other personnel moved that week. Doc. 48-5 at 48:13-15. However, according to Dr. Sharkins, while she was away attending the conference, IT informed her secretary that they were not going to disconnect Dr. Sharkins's computer because they were uncertain where her office would be moved. Doc. 48-1 at 145:12-18. Upon returning from the conference, Dr. Sharkins never reached out to logistics or IT to move her or follow up on the status of her relocation. Doc. 48-1 at 150:3-151:8. When she later asked Dr. Linebarger why she had not been moved, he said, "they were working on it." Doc. 48-1 at 159:3-4.

Although Dr. Sharkins had not physically moved into her new office, new furniture had been bought for her office and temporary furniture, a desk and chair, were in place. Doc. 48-5 at 28:1-8. After the intended moving week, because of the move and the condition of the old building, the building's boiler had to be turned off. *Id*. at 39:7-9. For the employees who remained in the building, which included African American employees on a different floor, space heaters were available upon request. *Id*. at 40:2-4, 50:13-21. Dr.

Sharkins, already possessing a space heater, received another after an employee submitted a request for her. Doc. 48-1 at 162:9-13. Dr. Sharkins remained in the office until she resigned.

**D. EEOC Charge and Resignation**

Dr. Sharkins filed an EEOC charge on November 22, 2023. Doc. 48-10 at 2. In her charge, among other things, she alleged race and gender discrimination was behind the above-mentioned events, including the new administrative certification requirement, delays in her move, and the alleged manipulated performance rating. *Id.* Further, she alleged she was being constructively discharged to make way for an African American to replace her. *Id*. at 3-4. Subsequently, she submitted her letter of resignation on December 6, 2023. Doc. 48-1 at 164:13-17.

Following her resignation, Tara Carr, an African American female equipped with an administrative certification, replaced Dr. Sharkins in the interim role until she was appointed as director. Doc. 48-3 at 35:18-36:1, 102:18-20.

**DISCUSSION**

**A. Dr. Sharkins properly exhausted her administrative remedies.**

Following receipt of her Right to Sue letter from the EEOC, Dr. Sharkins filed her complaint in this Court on July 18, 2024. In their summary judgment motion, Defendants argue that Dr. Sharkins "failed to exhaust her administrative remedies" because her EEOC charge was filed before she resigned and not later amended to include the fact that she resigned. Doc. 49 at 14-15. They argue because the charge was filed before an essential element was satisfied, Dr. Sharkins only put Defendants on notice of an "alleged campaign

to push her out based on a hostile work environment and/or disparate treatment theory, [but] it could not and did not put the agency on notice of an actual constructive discharge, because the claim did not yet exist." *Id*. at 15. Upon review, the Court finds that Dr. Sharkins properly exhausted her administrative remedies.

Before filing a complaint under Title VII, an employee must file a charge of discrimination with the Equal Employment Opportunity Commission. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022). The exhaustion requirement gives the EEOC the "first opportunity to investigate the alleged discriminatory practices." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004) (citations omitted). The exhaustion inquiry here is "whether [plaintiff's] complaint was like or related to, or grew out of, the allegations" made in the EEOC charge. *Id.* at 1280. A judicial claim is generally allowed if it "amplif[ies], clarif[ies], or more clearly focus[es]" the claims made before the EEOC. *Id.* at 1279. Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under" Title VII. *Gregory*, 355 F.3d at 1280 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460–61 (5th Cir. 1970) [4]). While judicial complaints do not need to be exact replicas of EEOC complaints, "allegations of new acts of discrimination are inappropriate." *Id*. at 1280 (citation omitted).

Here, Dr. Sharkins's EEOC charge was filed on November 22, 2023, and alleged the above-mentioned events. Doc. 48-10 at 2-4. It explicitly noted, "I am being constructively discharged to make way for an African American." *Id*.

---

[4] Here, and elsewhere in this Opinion, the Court cites to non-binding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

To support their argument that Dr. Sharkins did not satisfy all the elements required for a constructive discharge claim prior to filing the charge, Defendants cite to *Green v. Brennan*, 578 U.S. 547, 555 (2016), and state in their brief that, "[a] constructive discharge claim requires both discriminatory conduct of a kind that would compel a reasonable employee to resign ***and*** the employee's actual resignation." Doc. 49 at 15. Although *Green* notes that "[o]nly after both elements are satisfied can [plaintiff] file suit to obtain relief," Defendants are conflating a claim in a judicial action for damages with the filing of an EEOC charge with an administrative agency. *Id*. As noted above, an EEOC charge is designed to give the EEOC the first opportunity to investigate the alleged discriminatory practice; however, the claim in a judicial action is a more clearly focused pursuit, with evidentiary proof, of the claims raised in the charge. Because of the preliminary nature of an EEOC charge, the lack of proof for all elements of the future judicial claim at the time of filing the charge does not automatically bar the claim.

Here, Dr. Sharkins's showing at the EEOC explicitly mentions the words "constructive discharge" in her EEOC charge. On this record, it is inconsequential whether all the elements of her claim were satisfied at the time it was filed; the EEOC and Defendants were clearly on notice of her constructive discharge claim when she filed the claim before she resigned.

The other cases Defendants cite to in support of their position involve instances where the defendants actually did not receive proper notice of the pending claims because new acts were alleged that were unrelated to the EEOC charge. Thus, those acts were barred as unexhausted. *See Ellison v. Postmaster General*, *United States Postal Service*, 2022 WL

4726121, at *8 (11th Cir. 2022) (holding, plaintiff's claim was barred because he did not amend his EEOC charge to include a new retaliatory act alleged in his judicial complaint); *Slayden v. Ctr. for Behavioral Med.*, 53 F.4th 464, 469 (8th Cir. 2022) (holding plaintiff's constructive discharge claim was barred because it was not reasonably related to his charge allegations "where the charge did not assert that he had been or was about to be constructively discharged . . . [plaintiff's] charge gave no indication that he was about to be constructively discharged") (citation omitted); *Chestnut v. Walmart,* 2024 WL 5304874, at *9 (S.D. Ala. Nov. 1, 2024) (holding plaintiff's claim was barred because she did not amend her EEOC charge based on a new wrongful termination claim included in her judicial complaint); *Edom v. Chronister*, 2021 WL 4244845, at *13 (M.D. Fla. Sept. 17, 2021) (holding plaintiff's claim was barred because he did not amend his EEOC charge, which only alleged race and sex discrimination, to include his allegations concerning the constructive termination claim alleged in his judicial complaint). These cases are not analogous because Dr. Sharkins's charge properly put the EEOC and Defendants on notice of a constructive discharge claim. Therefore, it did not matter whether Dr. Sharkins had resigned at the time of filing or whether she had amended her EEOC charge to include that fact.

**B. Dr. Sharkins cannot prove disparate treatment under any theory.**

Dr. Sharkins argues that Defendants violated Title VII by discriminating against her based on her sex and race. Doc. 53 at 16. Title VII prohibits employers from discharging an employee, or otherwise discriminating against that employee with respect to the employee's terms, conditions, or privileges of employment "because of" that person's race

or sex. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may present either direct evidence, circumstantial evidence, or both to support a discrimination claim. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). To survive a summary judgment motion, a plaintiff asserting a claim for unlawful discrimination in violation of Title VII must present sufficient facts to permit a jury to rule in her favor. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).

As best the Court can tell, Dr. Sharkins attempts to meet the summary judgment standard by presenting circumstantial evidence in the form of the convincing mosaic approach, *McDonnell Douglas* order of proof, and mixed-motive theory of liability. However, because of the severe lack of organization in Dr. Sharkins's brief and her sweeping reliance on the bold conclusion that "[t]he whole record permits a finding of intentional discrimination" (Doc. 53 at 18), the Court is left to piece together different arguments and incidents into each framework as noted below. *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (The Court does not have to emulate "pigs [] hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Regardless, under any theory, she cannot prevail.

**1. Convincing Mosaic**

A plaintiff can survive summary judgment on a Title VII claim by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Tynes*, 88 F.4th at 946. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial

evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (internal quotation marks, footnote, and citation omitted).

A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, "(1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly-situated employees; and (3) [a showing] that the employer's justification is pretextual." *Hall v. Coal Bed Servs. Inc.*, 2026 WL 2581843, at *4 (11th Cir. Sept. 1, 2026) (quoting *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024)) (quotation marks omitted and alterations adopted). An inference of racial discrimination "is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." *Smith*, 644 F.3d at 1328 n.25 (internal quotation marks and citation omitted).

In viewing the evidence in the light most favorable to Dr. Sharkins, no jury could infer discrimination on the part of Defendants for two reasons: first, Dr. Sharkins's claims are general and conclusory, and second, she fails to tie any of these incidents to evidence of racial or gender animus (whether white, female, or white-female). *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (stating that "conclusory allegations without specific supporting facts have no probative value."); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc) (stating that "[t]he role of this Court is to prevent unlawful [Title VII] practices, not to act as a super personnel department that second-guesses employers' business judgments. Our sole concern is whether unlawful

discriminatory . . . animus motivates a challenged employment decision." (alterations in original) (citation omitted)).

**a) Suspicious Timing, Ambiguous Statements, and Other Information from which Discriminatory Intent may be Inferred**

In piecing together Dr. Sharkins's arguments under this framework, the Court begins with her argument regarding relocation. Specifically, she argues, "the [new] office was not just a ready office that she refused; rather, the relocation evidence [and the fact that Defendants failed to move her] supports an inference of differential treatment." Doc. 53 at 21. Though the parties dispute the conversations that took place between Dr. Linebarger and Dr. Sharkins regarding the status of her move, when viewing the evidence in the light most favorable to Dr. Sharkins, the undisputed evidence shows that her relocation was delayed, and an office space was available for her but it was not fully equipped with new furniture. These facts will not support a reasonable inference that the reason she was not relocated was based on discriminatory intent. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 247–48 (emphasis omitted)) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

It is undisputed that Dr. Sharkins had an office in the new building. She was included in Dr. Linebarger's initial email regarding room assignments, which placed her in "Building D next to Huntley." Doc. 48-1 at 134. She testified that Dr. Linebarger had written her name on a piece of paper and taped it on a door in the new building. Doc. 48-1

at 141:18-21. Further, Anderson also testified that Dr. Sharkins was given input into what the space needed prior to the move. Doc. 48-5 at 27:2-7.

Although a delay occurred, the undisputed evidence shows that Dr. Sharkins was out of town when everyone on her floor moved, and she never called logistics or IT to move her when she returned. Doc. 48-1 at 150:6-14. She simply stayed in place even though her new office had temporary furniture ready for her to use. Doc. 48-5 at 28:1-12. Dr. Sharkins testified that in response to her question of when she could move, Dr. Linebarger stated, "they were working on it," but there is still no hint of gender or racial animus in this delay. Notably, she was not the only employee waiting, still, to be moved. The evidence presented paints a picture far from showing a suspicious delay in which discriminatory intent could be inferred. Thus, her assertion that discriminatory differential treatment was the reason for her delay is unsupported by evidence and conclusory. *See Evers,*770 at 986.

Dr. Sharkins makes a nonsensical argument that racial intent can be gleaned from the "racial context" of differential treatment related to the relocation, because "[b]y the time of the . . . move, the other white employee [on her floor] had already been relocated, and the remaining department members [with her in the old building who] Dr. Sharkins recalled were African American." Doc. 53 at 21. Anderson, Dr. Linebarger, and Dr. Sharkins all testified in their respective depositions that the finance department, who had African American employees, were still in the old building after the initial move. Doc. 48-5 at 51:6-11; Doc. 48-4 at 85:10-12; Doc. 48-1 at 169:16-19. Thus, Dr. Sharkins has established that the initial group move to the new building in October involved white

employees (at least one) and African American employees, and thereafter white employees (at least one, Dr. Sharkins) and African American employees remained in the old building awaiting their move. While Dr. Sharkins also argues that she was the only person left on her floor leading to her isolation (Doc. 53 at 22), which is disputed, this fact viewed in her favor does not provide any evidence to draw a reasonable inference that the isolation was because of her race or gender when viewed in the *factual* context developed by the record. Doc. 48-1 at 148:15-16; Doc. 48-4 at 69:13-16.

Dr. Sharkins also alleges that her office was in an objectively inferior physical condition compared to the offices in the new building, and that inferiority supports an inference of discriminatory intent. Doc. 53 at 22. Specifically, she alleges intent can be inferred because the boiler was permanently disabled and portable space heater units were not proactively supplied. *Id.* Dr. Sharkins ignores the fact that the boiler was turned off while other African Americans remained in the building, which tends to negate an inference of discriminatory intent. Doc. 53 at 21. Anderson's testimony validates why a reasonable juror could only believe that the boiler being turned off was necessary, not suspicious or targeted based on her race or gender. He states, "[the boiler] is one reason why we relocated from [the old] building: [t]he boiler system was going down in the building." Doc. 48-5 at 39:7-9. Further, the boiler had to be turned off because "through the period of . . . the renovation of the new area, we had areas within [the old] building that could not be heated and cooled with that current system because of the condition it was in, and we provided small units for those areas to be able to utilize to have heat and air." *Id.* at 39:16-22.

Although Dr. Sharkins argued that she did not proactively receive a heater, it is clear that "proactivity" was not Montgomery Public Schools protocol and that protocol had nothing to do with race or gender. Doc. 48-5 at 40:2-4. Heaters were provided upon request, and Dr. Sharkins never requested one. *Id*. It is not this Court's duty to second guess Defendants' "business judgment" with respect to timing of passing out equipment. *See Gogel,* 967 F.3d at 1148. None of the events regarding the move give any basis to infer discrimination occurred.[5]

Next, Dr. Sharkins argues Defendants' decision, without prior warning, to blame her for the delayed Kindergarten Round-up without witness statements, emails, or an investigation of her response identifying the other causes for delay permit a finding of discrimination. However, similar to the relocation incident, Dr. Sharkins presented no evidence from which discriminatory intent may be inferred. The relevant memorandum of concern stated, among other things, that administration has "continuously witnessed a high degree of non-responsiveness on [Dr. Sharkins's] part of leading the initiative," and that "[the administration] has accepted the need to constantly review and support the responsibility of this assignment with others." Doc. 54-5 at 2. In her response to the letter of concern, Dr. Sharkins admitted not communicating with certain parties with weekly updates, and she acknowledged that she could have "provided a general overview . . . to the principals." Doc. 54-6 at 2.. Thus, even in viewing Dr. Sharkins's evidence in the light

[5] Although, the events regarding the relocation appear to be the only thing argued in Dr. Sharkins's brief regarding an "inference of differential treatment," as referenced above, in viewing the evidence in the light most favorable to her and determining if she alleged sufficient facts to permit a jury to rule in her favor, the Court will nevertheless view the other alleged incidents in considering the full mosaic of circumstantial evidence.

most favorable to her, these issues speak to far more than third-party delays; but rather, to a lack of communication from the person in charge of the event—Dr. Sharkins. *See Campbell v. Mayo Clinic Inc.*, 2024 WL 713921, at *3 (11th Cir. 2024) (holding plaintiff failed to prove defendant engaged in a suspicious, discriminatory campaign to find fault in her performance when the circumstantial evidence alleged showed the defendants had attempted to improve plaintiffs job performance, and only after plaintiff did not show improvement and continued poor performance was she subjected to an adverse action). The record reflects that Defendants worked with Dr. Sharkins by delaying the event, and no evidence of discrimination based on race or gender could be inferred from this objectively reasonable response to Dr. Sharkins's admitted failures.

Dr. Sharkins also argues that a jury may reasonably infer that the administrative certification credential was a barrier created for Dr. Sharkins as a white-female, not a neutral qualification consistently governing the job. This conclusion lacks evidentiary support for a reasonable inference of discrimination. Specifically, Dr. Sharkins points to no evidence that this requirement was imposed unequally or imposed specially because of her race or gender. As to suspicious timing, although the certification was not listed in her original job description (Doc. 48-3 at 223-224), Dr. Linebarger testified that the need for the certification likely changed with the new superintendent and the turnover in supervisors. Doc. 48-4 at 80:13-16. Dr. Linebarger believed the new supervisor/superintendent needed her to be able to evaluate her own employees, and this was consistent with Dr. Linebarger's experience in other school districts where director-level employees did so. Doc. 48-4 at 20:12-17, 29:1-3, 76:10-17. The record shows it was

a reasonable, not discriminatory, explanation that different supervisors might be accustomed to their directors having the ability to perform this task and desired certain credentials. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001) ("Differences in treatment by different supervisors or decisionmakers can seldom be the basis for a viable claim of discrimination."). The Court will not second guess this business judgment. *See Gogel,* 967 F.3d at 1148.

Although the parties dispute whether Dr. Sharkins was ever given the opportunity to obtain the certification, that dispute is not material, as Dr. Sharkins presents no evidence to infer that the amorphous timeline to secure the credential was due to racial or gender animus. The memo mandated no deadline for her to secure the certification. Doc. 48-7 at 2. Whether she requested time or help getting the credential, wrote or expressed a plan to do so, or otherwise pursued getting the credential is not material. Defendants testified that she would not be fired for not having the certification and that she was not given a hard deadline to obtain it. Doc. 48-3 at 80:23-81:3. Moreover, Dr. Sharkins's testimony that "[s]he understood the memo of concern to mean that she was going to be fired because she didn't have the administrative certification," is entirely speculative. Doc. 48-1 at 113. *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) ("Inferences based upon speculation are not reasonable."). Thus, there is no evidence from which discriminatory intent may be inferred.

Last, Dr. Sharkins argues the incident regarding her desired evaluation rating being blocked by "unidentified higher-ups," and the "instruction to look elsewhere" for a job permits a finding of intentional discrimination. Dr. Sharkins points only to her supervisor's

gender and race and speculation as to the referenced unidentified higher ups to demand an inference that this review or the conversations within support an inference of discriminatory intent. They do not. Crediting Dr. Sharkins's testimony about Dr. Mitchell's statements, she did not ask who the "unidentified higher-ups" were. Doc. 48-1 at 61:12-13. She speculates it was higher up black males. Doc. 48-10 at 3. As to the "instruction" to look for another job, Dr. Sharkins admits in her deposition that the comment was made due to several concerns including, among other things, the "tension within Montgomery Public Schools"[6] and the memo of concern she had recently received. Doc. 48-1 at 70:18-20; 78:1-6. Dr. Mitchell does not recall the statements specifically, but he acknowledged that he gave this general advice to his employees. Doc. 48-2 at 45:16-20. When rooted in the evidentiary record and not speculation, this statement is far from suspicious and far from having any discernable discriminatory intent.

**b) Comparator**

Next, Dr. Sharkins needed to provide a comparator or similarly situated employee to prove there was "systematically better treatment of similarly situated employees." To be similarly situated to the plaintiff, the employee must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218. For example, such an the employee will have engaged in similar conduct or misconduct, be subject to the same employment policies or guidelines, ordinarily have been under the jurisdiction of the same supervisor, and share the plaintiff's

[6] As noted, MPS was under state intervention due to deficiencies during much of her tenure.

employment or disciplinary history. *Lewis*, 918 F.3d at 1227-1228. "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228.

Dr. Sharkins identifies her successor, Tara Carr, who is an African American female, as a potential comparator.[7] Doc. 53 at 23. Yet, for purposes of her mosaic argument, replacement alone is insufficient to find this moves the needle on the ultimate question—whether a reasonable jury could find in her favor. *See Ossmann v. Meredith Corporation*, 82 F.4th 1007, 1020 (11th Cir. 2023) (holding that a plaintiff failed to establish a convincing mosaic when he offered no facts other than an EEO form and his replacement's race). Dr. Sharkins cannot prove that Carr received systematically better treatment because of her race. Dr. Sharkins's argues that Carr's job description, like her own, omitted the certification that was required for her and, thus, Carr was treated better. Doc. 53 at 23. However, Carr did possess the administrative certification. Doc. 48-3 at 102:19-20. Dr. Sharkins's argument, without other supporting facts, that she was replaced with a black female who held the certification fails to support an inference that the black female was treated better than Dr. Sharkins because she is a white female. *See Ossmann*, 82 F.4th 1007, 1020.

Dr. Sharkins also argues that the Board "admits that three complaints against Carr led to no discipline." Though this assertion too provides no evidence that Carr was treated more favorably. The complaints and grievance came from employees who reported to Carr and who complained about things like her enforcement of a no cell-phone rule, talking in

---

[7] To the extent she relies on gender alone (and not race-gender), she offered no male comparator.

a condescending manner, issuance of a performance improvement plan, and letters of concern to subordinates to address job performance. *See* Doc. 54-12. Ozella Ford, the designated representative of Montgomery County Board of Education and Montgomery Public Schools, testified that the complaints were properly investigated and that no disciplinary action was taken against Carr because the complaints and grievances were not substantiated. Doc. 48-3 at 39:10-15. Dr. Sharkins does not dispute this testimony. In any event, Dr. Sharkins does not claim that similar complaints or grievances were mounted against her by her subordinates that did lead to discipline, which might demonstrate relevant differential treatment. There is no evidence that suggests Carr was systematically treated better than Dr. Sharkins was because Carr is a black female.

**c) Pretext**

Finally, Dr. Sharkins attempts to prove pretext. To show pretext, a plaintiff must first, "cast[] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) show[] that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establish[] that the employer has failed to clearly articulate and follow its formal policies." *See Lewis v. City of Union City*, 934 F.3d 1169, 1186 (11th Cir. 2019). In applying the same events from the record to the pretext analysis, viewing the evidence in the light most favorable to Dr. Sharkins, she cannot make a proper showing.

Regarding the kindergarten open house, Dr. Sharkin's argues that a jury might disbelieve Defendants stated reasoning of why she was blamed for the delay. Doc. 53 at

20. First, Dr. Sharkins takes aim at the "sole-fault discipline" that she was issued. *Id*. However, she does not provide sufficient evidence to cast doubt on the Defendant's reasoning for issuing the memo or that the reason for the issuance was false and hid discrimination. As previously explained, it is entirely reasonable that, because Dr. Sharkins oversaw the event, she was the one who was blamed for the delay. *Alvarez v. Royal Atlantic Developers, Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010) (stating that the "inquiry into pretext centers on the employer's beliefs not the employee's beliefs"). Indeed, as noted above, there were parts of the memo of concern that were solely and admittedly her fault. Doc. 48-7 at 2; *see id*. (holding that the "question was not whether . . . it was [plaintiffs] fault that assignments were not completed on time . . . the question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so . . . ."). Second, Dr. Sharkins argues that she did not receive a prior warning before the memo of concern was issued to her. Ford testified that prior verbal warnings to Dr. Sharkins had to have issued, but Dr. Sharkins argues that a jury does not have to believe an undocumented assumption because there is no written evidence that those conversations occurred. Doc. 48-3 at 51:15-16. It appears Dr. Sharkins is trying to satisfy the third prong of the pretext analysis, that Defendants had failed to clearly articulate and follow its formal policies. *See Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002) (holding, to establish pretext based on failure to follow internal procedures, a plaintiff must show that the employer's "deviation from policy occurred in a discriminatory manner"). Even so, "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that

the substantive reasons given by the employer for its employment decision were pretextual." *Springer v. Convergys Customer Management Group Inc*., 509 F.3d 1344, 1350 (11th Cir. 2007) (citing *Kennedy v. Landon,* 598 F.2d 337, 341 (4th Cir. 1979) (quoting *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir. 1995). Dr. Sharkins cannot impugn the intent behind the memo, given her own acknowledged shortcomings, based on speculation about the verbal warning. Dr. Sharkins has not cast sufficient doubt on Defendant's reasoning for issuing the memo of concern to her.

As to the certification requirement, Dr. Sharkins argues that a jury may not believe Defendants stated reason for requiring the credential. Again, there is no credible evidence to cast doubt on Defendants' reasoning for imposing the requirement other than Dr. Sharkins's conclusory statements. Defendants testified that the certification was required by statute and that it was imposed on other employees at Montgomery Public Schools in evaluative roles. Doc. 48-3 at 60:7-10, 97:20-22. Further, a reasonable fact finder could conclude that Defendants stated reason for requiring the credential, that a director tasked with evaluating employees should have specialized leadership training, is sufficient. *See Alvarez*, 610 F.3d at 1266 (holding that a plaintiff cannot "recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer."). The record does not support an inference of discrimination based on the credential.

As to the relocation, Dr. Linebarger maintains that Dr. Sharkins chose to stay in the building while her office was ready for her to move into. Doc. 48-4 at 55:1-2. Viewing the evidence in the light most favorable to Dr. Sharkins and noting her testimony that instead Dr. Linebarger told her to hold off on moving, still fails to suggest the relocation could be

related to her race or gender. There is no evidence to suggest she would not be relocated to the space with her name on the door. Dr. Sharkins had a room assignment, temporary furniture in place, and new furniture had been ordered for her new office. Doc. 48-5 at 28:1-12. This all points to the office being ready, or nearly ready, not an ulterior motive by Dr. Linebarger, even if he delayed her move, to intentionally isolate Dr. Sharkins because of her race or gender.

Finally, as to the incident regarding the performance review and Dr. Mitchell's advice to look for another job, no pretext is demonstrated. According to Dr. Sharkins, in response to her self-evaluation, Dr. Mitchell told her, "he was not permitted to give" a four rating because in a single category "they wouldn't allow it." Doc. 48-1 at 61:12-13. With evidence, it is possible a legitimate argument could be made that Defendants were not following their form policies; however, that is not the case here as no other evidence was alleged. *See Rojas*, 285 at 1344 n.4 (11th Cir. 2002). The attributed road-block statement by unknown individuals is not enough to suggest what actually motivated the rating was discriminatory intent. As to the allegations that Dr. Mitchell told Dr. Sharkins to look for another job, Dr. Sharkins provides her own explanation of why Dr. Mitchell made these comments which, among other things, does not include any hidden discriminatory intent. Doc. 48-1 at 70:18-23.

For the above-stated reasons, Dr. Sharkins has not offered enough evidence for a reasonable jury to infer illegal discrimination using the convincing mosaic analysis.

**2. McDonnell Douglas**

Even if Dr. Sharkins cannot survive summary judgment on a Title VII claim using the convincing mosaic framework, she can satisfy Rule 56 using the *McDonnell Douglas* framework. *See Ossman*, 82 F.4th at 1014. "When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. This creates "a rebuttable presumption of intentional discrimination." *Ossman*, 82 F.4th at 1014. "To rebut that presumption, [the defendant] needs to produce evidence of a valid, nondiscriminatory reason" for the challenged action. *Id.* Burden-shifting aside, the ultimate inquiry is whether the record establishes enough that a reasonable jury could find in favor of the plaintiff. *McCreight v. AuburnBank*, 117 F.4th 1322, 1335, 1340 (11th Cir. 2024) (explaining that, regardless of which discrimination test applies, the "final question . . . is whether a reasonable jury could infer illegal discrimination. . . . [A]ll roads lead to Rule 56—so long as a plaintiff offers enough evidence for a reasonable jury to infer illegal discrimination, her Title VII claim will survive summary judgment.").

The crux of Dr. Sharkins's prima facie case boils down to whether she can show adverse action to make a prima facie case of discrimination under *McDonnell Douglas*.[8] In

[8] As to whether Dr. Sharkins belongs to a protected class and was qualified to perform the job in question, Defendants appear to concede these elements in their opening brief because they do not raise or provide

*Muldrow*, the Supreme Court held that to show an adverse action under Title VII, the plaintiff must show the action brought "some harm" as to an identifiable term or condition of employment but need not show "significant harm." 601 U.S. 346, 354-355 (2024). In other words, an employee need only show that there was a "disadvantageous" change to a term or condition of employment. *Id.* at 354. The Court reiterated, "'Discriminate against means treat worse, here based on sex.'" *Id*. at 355 (citing *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 657-658, 681 (U.S. 2020)). "Adverse action cannot be speculative." *Zienni v. Mercedes-Benz U.S. International, Inc.*, 2025 WL 3708825, *4 (11th Cir. 2025) (quoting *Jefferson v. Sewon Am. Inc.*, 891 F.3d 911, 921 (11th Cir. 2018)).

Dr. Sharkins argues that she suffered "some harm" to the terms and conditions of her employment by the above-stated record and by her constructive discharge. However, her argument does not satisfy the standard under *Muldrow*.

Concerning the open house "uninvestigated blame memoranda," no tangible harm was suffered by Dr. Sharkins because the reprimand had no bearing on Dr. Sharkins's pay, duties, or title. Doc. 48-3 at 123:3-11. It was negative and displeasing, but negative feedback or discipline without consequences is not "some harm." Pre-*Muldrow* caselaw remains persuasive in this context where "[t]he reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." *Summerlin v. M&H Valve Co.*, 167 F. App'x. 93, 97 (11th Cir. 2006) (alteration

---

any analysis of these issues. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014) (stating that abandonment can occur when a party makes "passing references" to an issue without making any argument or citing to legal authority).

added) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). Finding "some harm" requires some *thing* to point out; a displeasing feeling will not suffice.

The undisputed evidence shows that the memorandum is an acknowledgement of Dr. Sharkins's shortcomings, not a disadvantageous change to her employment. Even under the *Muldrow* standard, a negative memo in these circumstances must be viewed as insufficient to show "some harm." The same reasoning applies to the alleged "unidentified superiors" who affected the formal self-evaluation process. Regardless of the single rating that Dr. Sharkins disagrees with, the record reflects that she suffered no tangible harm because of the review, and the review did not affect her pay, duties, or title.

Dr. Sharkins next argues she suffered some harm due to the certification requirement. Though because Dr. Sharkins never evaluated employees, a request for her to obtain the certification with no hard deadline had no effect on the terms and conditions of her employment. Doc. 48-1 at 104:2-5. Further, Dr. Sharkins's conclusion that she would be fired without the certification is purely speculative, rebutted by Defendants' testimony, and unsupported by the terms of the memo. *See Zienni*, 2025 WL 3708825, at *4.

The relocation incident, albeit the closest issue to the "some harm" line, also does not qualify as an adverse action. On its face, being forced to be cold and alone on the floor of a diminished-use building might arguably be "some harm" but not on this record. Viewing the evidence in the light most favorable to Dr. Sharkins and making reasonable inferences in her favor, the record does not support a finding she was intentionally isolated or delayed in her move such that some harm was suffered. The record reflects that Dr.

Sharkins had an office ready to move into. Doc. 48-5 at 28:1-12. Indeed, Dr. Linebarger informed her by email of her new office location along with the other employees who were moving.

Dr. Sharkins testified Dr. Linebarger had written her name on a piece of paper and taped it on a door in the new space. Doc. 48-1 at 141:18-21. While she remained in the old space, she received a space heater, like other employees who remained in that building. Doc. 48-1 at 162:9-13. While she testified that she was alone on her floor, the record reflects that others remained in the building with her while it was being vacated a bit at a time. Doc. 48-5 at 51:6-11; Doc. 48-4 at 85:10-12; Doc. 48-1 at 169:16-19. Any other delays in her relocation appear to be caused by standard business practices because of Dr. Sharkins's absence on moving day, her subsequent actions not to contact IT and logistics when she returned, and Dr. Linebarger's suggestion that she hold off on the move. *See Gogel,* 967 F.3d at 1148. The record shows her job remained the same, she had an office space, furniture on the way, and would be relocated. A delay in moving from the old office where it was cold or isolated on this record does not support a finding of a disadvantageous change being imposed on Dr. Sharkins. *See Muldrow*, 601 U.S. at 359 (finding plaintiff could show some harm (e.g., that she was worse off) where plaintiff alleged she was transferred from a prestigious division with substantial responsibility over priority investigations and frequent opportunity to work with police commanders to a role with far less involvement in high-visibility matters and performing primarily administrative work, her schedule became less regular, requiring weekends, and she lost her take-home car).

Dr. Sharkins also notes that the culmination of these above-mentioned events provide a basis for her constructive discharge claim which would also satisfy the adverse action standard. Doc. 53 at 17. However, as noted below, this Court does not find that these events constituted a constructive discharge and does not find that each event weighed together would satisfy the adverse action standard announced in *Muldrow*.

Even if Dr. Sharkins could satisfy the adverse action requirement, she cannot satisfy the requirement that "the [Defendants] treated 'similarly situated' employees outside [Dr. Sharkins] class more favorably." Similar to the above-mentioned comparator analysis, the record provides no evidence that Tara Carr (the only offered similarly situated employee) was treated more favorably because of her race. *See Ossman*, 82 F.4th 1007, 1020. Carr had the proper certification, and just because Carr did not receive discipline for the complaints lodged against her after investigation does not support an inference that she was treated more favorably on this record where Dr. Sharkins does not allege she was subjected to complaints that resulted in discipline. For either reason, Dr. Sharkins has not offered enough evidence to establish a prima facie case under *McDonnell Douglas*.

**3. Mixed-Motive**

Another alternative to satisfy Rule 56, the mixed-motive framework, requires only that "a plaintiff . . . show that a protected consideration contributed in some way to the outcome—even if it ultimately changed nothing." *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1339 (11th Cir. 2023). An employee can succeed under a mixed-motive theory by presenting evidence showing that discriminatory input factored into the decisional process that resulted in the adverse employment action. *Quigg v. Thomas Cnty. Sch. Dist.,*

814 F.3d 1227,1241 (11th Cir. 2016). This can include evidence such as discriminatory statements by those involved in the decisional process. *Id*.

As noted above, Dr. Sharkins cannot prove that she suffered from an adverse employment action. However, even if this Court were to find that Dr. Sharkins suffered an adverse employment action, she cannot prove that any discriminatory input factored into any decisional process. Dr. Sharkins repackages the same arguments as above for this theory: "the uninvestigated blame; an instruction to look elsewhere; a newly asserted credential absent from the before-and-after job descriptions; a written offer to cure met with silence; predominantly African American coworkers moved while the white female director remained; an African American successor; and shifting corporate explanations." Doc. 53 at 25. Although the framework is different, there is no new evidence to suggest discriminatory input factored into the decisional process, and thus Dr. Sharkins has not offered enough evidence for a reasonable jury to infer illegal discrimination using the mixed motive test.

*McDonnel Douglas*, convincing mosaic, or mixed-motive, "[w]hichever path is used, the destination is the same: an answer to whether the evidence is sufficient for a reasonable jury to infer illegal discrimination." *Hall*, 2026 WL 2581843, at *4 (citing *McCreight*, 117 F.4th at 1335). Here, the answer is, No.

**C. Dr. Sharkins cannot prove constructive discharge.**

Dr. Sharkins argues that the cumulative weight of Defendants' actions compelled her resignation and constituted a constructive discharge. Doc. 53 at 25. Dr. Sharkins points to the above-stated record to support this claim.

"A '[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1287 (M.D. Ala. 2011) (alteration in original) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)). "Whether an employee's working conditions were so intolerable is an objective question." *Id.* (citing *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1363 (11th Cir. 1994) ("A claim for constructive discharge requires the employee to demonstrate that the work environment and conditions were so unbearable that a reasonable person in that person's position would be compelled to resign."). "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable." *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1302 (11th Cir. 2005). It is the plaintiff's burden to make this showing. *Menzie v. Ann Taylor Retail Inc.,* 549 F. App'x 891, 894–95 (11th Cir. 2013) (citing *Poole v. County Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)).

Here, Dr. Sharkins alleges that her work conditions were intolerable because she was "professionally marginalized and physically isolated." Doc. 53 at 25-29. In her brief, she analogizes her circumstances with the ones in *Poole*, *Akins*, and *Bryant*; however, all three of these cases paint a far more severe picture. *See Bryant*, 575 at 1290 (denying summary judgment on a constructive discharge claim where the plaintiff, without warning or explanation, was stripped of her title, asked to report to a new manager, her boss attempted to move her to a windowless office that had been previously used as a storage area, she was ignored when offering any input, and her job was reduced to "coloring

maps”); *Akins*, 420 F.3d at 1301–02 (denying summary judgment on a constructive discharge claim where the court found that the evidence showed that plaintiffs were stripped of their previous responsibilities, excluded from meetings, isolated from coworkers, and accused of engaging in illegal behavior); *Poole*, *at* 129 F.3d at 552-53 (denying summary judgment on a constructive discharge claim where plaintiff presented evidence that she was subject to various insults, given only a chair and no desk, isolated from conversation with other workers, and totally stripped of her previous responsibilities). In viewing the culmination of the evidence presented in the light most favorable to Dr. Sharkins, a reasonable person would not feel compelled to resign.

In support of her argument that she was professionally marginalized, Dr. Sharkins points to the alleged blocked support rating in a single area of her self-assessment. Doc. 53 at 26. However, again, this rating did not affect her title, duties, or pay. Doc. 48-1 at 66:8-15. This evaluation and particularly this single score within it had no tangible effect and does not rise to the level of intolerable conditions. *Pipkins v. City of Temple Terrace*, *Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) (“Repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job.”). As to the comment that she should look for another job, Dr. Sharkins’s admission that Dr. Mitchell’s statement was made due to a culmination of several factors, such as her failures regarding the open house, credits this as a reasonable response to Dr. Sharkins’s performance, and a far cry from intolerable conduct on its own. Doc. 48-1 at 70:18-20, 78:1-6.

Concerning the disciplinary memoranda, as noted above, the reprimand referenced valid concerns with Dr. Sharkins's performance but, again, had no bearing on her job duties, pay, or title. Doc. 48-3 at 123:3-11; *see Sanusi v. Grady Mem'l Hosp. Corp.*, 2025 WL 1661912, at *4 (11th Cir. June 12, 2025) (holding that plaintiff did not show that a written reprimand imposing actual consequences, specifically that plaintiff could not be promoted or transferred within her job for a year but allowed her to continue in her role, was not so unbearable that plaintiff was forced to resign). In accordance with *Sanusi*, because there were no actual consequences from Dr. Sharkins's reprimand, this conduct was not so unbearable that she was forced to resign.

Next, Dr. Sharkins argues the certification requirement created an intolerable condition. However, even if Dr. Sharkins was not offered a path to satisfy the certification requirement it does not rise to an intolerable condition. This is because her conclusion that she would have been fired for not having the certification is based only on speculation and because her job duties never changed. The Eleventh Circuit has only recognized intolerable work conditions stemming from job duties when the duties are seriously impacted. In *Bryant*, the plaintiff was stripped of her whole title; in *Akins*, the plaintiffs "work duties were removed"; and in *Poole*, the plaintiff was "[s]tripped of all responsibility." *See* 575 F.3d at 1290; 420 F.3d at 1301–02; 129 F.3d at 553. Because Dr. Sharkins never had the duty to evaluate employees, no duties were removed (or imposed), and this credential acquisition requirement, which had no deadline, was not intolerable.

In terms of isolation, Dr. Sharkins points to the evidence involving the relocation. However, this isolation is unlike the cases Dr. Sharkins relies upon. In *Poole*, the plaintiff

was given only a chair and no desk, unallowed to pack or store her belongings, and intentionally isolated by her boss, and in *Akins*, the plaintiff was excluded from meetings and isolated from coworkers. *See* 420 F.3d at 1301–02; 129 F.3d at 553. Here, there is no credible evidence of any intentional isolation like in *Akins* and *Poole*. While Dr. Sharkins was still in the old building, it is clear from the record that there were still members of a different department in the building with her. Doc. 48-5 at 51:6-11; Doc. 48-4 at 85:10-12; Doc. 48-1 at 169:16-19. This "isolation" is not comparable to situations such as *Bryant*, where the plaintiff's boss attempted to move her to a windowless office that had been previously used as a storage area. *See* 575 F.3d at 1290. As to her conditions, although the weather had been getting colder, Dr. Sharkins had two space heaters to keep warm. Further, there were other people in the building "tolerating" the same conditions. The evidence is insufficient to raise a triable question that an intolerable condition existed.[9]

Even when viewed cumulatively, Dr. Sharkins has not produced substantial evidence that conditions were so intolerable that a reasonable person in her position would have felt compelled to resign. Thus, her constructive discharge claim cannot survive summary judgment.

## IV. CONCLUSION

For the reasons stated above, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. 47) is GRANTED. A separate judgment will issue.

---

[9] The Court pretermits the discussion regarding whether the Board had notice and opportunity to correct the conditions, because this Court finds the conditions were not intolerable.

DONE this 16th day of September, 2026.

KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE